UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WASTE ACTION PROJECT,       )
                         )     Civil Action No. C12-1870RSL
       Plaintiff,       )
                         )     ORDER REGARDING CROSS-
      v.               )     MOTIONS FOR SUMMARY
                         )     JUDGMENT
DRAPER VALLEY HOLDINGS LLC, )
d/b/a DRAPER VALLEY FARMS,   )
                         )
       Defendant,     )
_____  )

       This matter comes before the Court on "Plaintiff's Motion for Partial Summary Judgment" (Dkt. # 41) and "Defendant Draper Valley's Motion for Summary Judgment" (Dkt. # 49). Having reviewed the memoranda, declarations, and exhibits submitted by the parties, the Court finds as follows:

## BACKGROUND

       This case was brought by a non-profit environmental and human health organization, Waste Action Project, against Draper Valley Holdings, LLC, for alleged violations of the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1365. Plaintiff alleges that defendant exceeded the limitations imposed by its

state waste discharge permit and failed to apply all known, available, and reasonable

methods of treatment and control ("AKART") to its effluent in violation of the Act.

Defendant does not deny that it violated certain numeric effluent limitations throughout

the limitations period, but argues that plaintiff lacks standing to pursue this citizen's suit

and denies that it violated the permit's AKART requirement.  Defendant also challenges

the adequacy of the pre-suit notice provided pursuant to 33 U.S.C. § 1365(b)(1)(A).

**A. The Clean Water Act**

    Section 301(a) of the Clean Water Act prohibits the discharge of pollutants

into navigable waters unless in compliance with the Act.  33 U.S.C. § 1311(a); <u>Nw.

Envtl. Advocates v. U.S. Envtl. Prot. Agency</u>, 537 F.3d 1006, 1020 (9th Cir. 2008)

("[T]he Act categorically prohibits any discharge of pollutant from a point source without

a permit.").  Congress directed the Environmental Protection Agency ("EPA") to

promulgate regulations setting limits on the pollutant discharges from three sources,

including (1) point sources discharging directly into navigable waters ("direct

dischargers"); (2) publicly owned treatment works ("POTWs") treating and discharging

municipal sewage or industrial wastewater; and (3) point sources discharging pollutants

into POTWs rather than directly into navigable waters ("indirect dischargers").  <u>See</u> <u>Nat'l

Ass'n of Metal Finishers v. U.S. Envtl. Prot. Agency</u>, 719 F.2d 624, 633 (3d Cir. 1983),

rev'd on other grounds, <u>Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.</u>, 470 U.S.

116 (1985).  Direct dischargers and POTWs are regulated through National Pollutant

Discharge Elimination System ("NPDES") permits issued to the discharger under 33

U.S.C. § 1342.  The effluent from indirect dischargers, such as defendant here, is subject

to separate pretreatment standards designed to "prevent the discharge of any pollutant through [the POTW], which pollutant interferes with, passes through or otherwise is incompatible with such works."  33 U.S.C. § 1317(b)(1).

Pretreatment standards may be imposed by the EPA or an authorized state or POTW:  where multiple standards exist for the same pollutant, the most stringent applies.  40 C.F.R. § 403.4.  In Washington, the applicable pretreatment standards for indirect dischargers, including numerical limitations and treatment requirements, are set forth in a permit.  Because the state waste discharge permit establishes the governing "pretreatment standard" for purposes of the Clean Water Act, a violation of the permit is a violation of 33 U.S.C. § 1317(d).

**B.  Relevant Waste Discharge Permits**

Defendant's waste discharge permit authorizes discharges from defendant's slaughterhouse to the Mount Vernon sanitary sewer and POTW under certain conditions. In particular, defendant's effluent is limited to a maximum consecutive three-day average of 1430 pounds of biochemical oxygen demand ("BOD") per day, a maximum consecutive three-day average of 825 pounds of total suspended solids ("TSS") per day, and a pH between 6.0 and 11.0 standard units.  It is undisputed that defendant exceeded one or more of these limitations at various times throughout the limitations period.[1]  The permit also requires defendant to use all known, available, and reasonable methods for

---

[1]  Plaintiff has identified 58 days on which Draper Valley exceeded its BOD limit, 76 days on which the TSS limit was exceeded, and 143 days on which the pH of the effluent fell outside the specified range.

3

treatment ("AKART") to pretreat its industrial wastes and to report discharge quality information to the Washington Department of Ecology on a monthly basis.

The Mount Vernon POTW has its own wastewater discharge limitations. The POTW has not had any permit excursions during the relevant time frame.

## DISCUSSION

### A.  Standing

In order to satisfy Article III's standing requirements, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. Allen v. Wright, 468 U.S. 737, 750 (1984). The "personal injury" element requires a showing that plaintiff suffered an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Its purpose is to ensure that the named plaintiff was actually injured and is entitled to an adjudication of the claim asserted, not merely abstractly distressed by unfounded fears or a wrong suffered by the public at large. Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 154, 156 (4th Cir. 2000).  The alleged injury need not be large:  an actual and genuine loss, even if a trifle, will suffice for standing purposes. See, e.g., U.S. v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14 (1973); Natural Res. Def. Council, Inc. v. U.S. Food and Drug Admin., 710 F.3d 71, 85 (2nd Cir. 2013).

An organization like Waste Action Project "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their

own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000).[1]  An individual member of Waste Action Project can show a cognizable injury by establishing "that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by defendant's conduct." Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1147 (9th Cir. 2000). "[T]he threshold question of citizen standing under the Clean Water Act is whether an individual can show that she has been injured in her use of a particular area because of concerns about violations of environmental laws, not whether the plaintiff can show there has been actual environmental harm." Id. at 1151.

In this case, Doris Brevoort is a member of Waste Action Project who lives within sight of the Skagit River and utilizes the river for spiritual renewal, recreation, bird-watching, and aesthetic enjoyment.  Ms. Brevoort is, however, aware that the waters of the Skagit River in and downstream of Mount Vernon are not as clean as other bodies of water in the area or even as clean as the upstream reaches of the river.  While she would like to get in the water, watch birds, and enjoy the aesthetic and spiritual attributes of nature close to home, she expends time and money traveling elsewhere to engage in these activities. She also believes that, if the Skagit River were healthier near the estuary, the local fisherman from whom she buys salmon would have better catches and more to sell.  Ms. Brevoort believes there is a correlation between the amount of pollutants going

---

[1]  Defendant challenges only the first element.

into the Mount Vernon POTW and the amount being discharged into the Skagit River. Thus, when defendant exceeds its permit limitations and sends additional pollutants to the POTW, Ms. Brevoort fears that the violations result in additional pollutants being discharged from the POTW over and above what would have been discharged had defendant stayed within its permitted limits.  Ms. Brevoort states that her concerns regarding the kind and amount of pollutants discharged from the POTW and their effects on the environment inhibit her use of the river and have diminished her enjoyment and appreciation of the resource.

Defendant argues that the alleged injuries to Ms. Brevoort's aesthetic, recreational, and spiritual interests do not satisfy the standing requirement because they are either unfounded or not fairly traceable to defendant's unlawful discharges. Defendant argues that any fears or concerns Ms. Brevoort has about utilizing the river are unreasonable because the POTW did not exceed its permit limitations at any point during the relevant period.  "The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff." Laidlaw, 528 U.S. at 181. Ms. Brevoort states, and defendant does not dispute, that she would like to utilize the river near Mount Vernon more often and for a wider range of activities, but does not do so because of the presence of pollutants.  Her enjoyment of the river is diminished as a result of the existence of pollution in the water even in the absence of proof that any particular contaminant has reached a level at which the water is unsafe.  The same situation was presented in Laidlaw, where the trial court found that there was "no demonstrated proof of harm to the environment" from Laidlaw's discharge of mercury in

excess of its permit limitations. Nevertheless, the Supreme Court determined that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity," notwithstanding the lack of injury to the environment. Id. at 183.

Defendant's primary argument appears to be that Ms. Brevoort's injuries are not fairly traceable to defendant's permit violations. Defendant argues that the expert opinions of David LaLiberte and Joseph Leyda are inadmissible, leaving no evidence from which a reasonable fact finder could conclude that defendant's excessive discharges resulted in an increase in pollutants finding their way into the Skagit River. The Court disagrees. Regardless of whether the opinions of Messrs. LaLiberte and/or Leyda are admissible, defendant's expert, Carl Adams, testified at deposition that as much as five percent of the total suspended solids in defendant's effluent gets through the POTW and is discharged into the Skagit River. Dkt. # 44-4 at 105-06. Defendant correctly points out that Dr. Adams' testimony is not entirely clear on this issue: he also testified that because the fats and other suspended solids coming from Draper Valley are processed by biological organisms, the bulk of the TSS in the POTW's effluent is made up of these organisms and contains an unquantifiably small amount of the TSS that was originally discharged from the Draper Valley facility. Dkt. # 57-2 at 96-97 and 110-14. In either case, however, the volume of TSS discharged from the POTW, whether in the form of fats and other suspended solids discharged by defendant or in the form of the bacteria introduced at the POTW to process those solids, increases when the volume of the

7

influent increases.  Thus, there is admissible evidence that supports Ms. Brevoort's belief that when defendant exceeds its permit limitations, the effluent from the POTW contains more pollutants than it otherwise would have.  That being the case, the Court further finds that the injuries of which Ms. Brevoort complains are fairly traceable to defendant's unlawful conduct and would likely be redressed, at least in part, by a favorable decision in this case.  "If a plaintiff can show that his claim to relief is free from excessive abstraction, undue attenuation, and unbridled speculation, the Constitution places no further barriers between the plaintiff and an adjudication of his rights."  <u>Gaston Copper</u>, 204 F.3d at 155.  The Court therefore finds that plaintiff has established standing for purposes of Article III.

Plaintiff must also satisfy the statutory standing requirements for bringing a citizen's suit under the Clean Water Act.  The Clean Water Act authorizes any citizen to commence a civil action on his own behalf against any person who is alleged to have violated an effluent standard or limitation.  33 U.S.C. § 1365(a).  A "citizen" is defined as "a person or persons having an interest which is or may be adversely affected."  33 U.S.C. § 1365(g).  The Supreme Court reviewed the legislative history of the Clean Water Act and concluded that the statutory grant of standing is at least as broad as Article III.  <u>Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n</u>, 453 U.S. 1, 16-17 (1981).  Thus, because plaintiff is able to prove an injury that satisfies Article III, it has "an interest which is or may be adversely affected" by the alleged discharge.

**B.  Violations of Permit Limitations**

Defendant does not dispute the underlying records on which plaintiff bases its allegations of permit violations or plaintiff's calculations regarding the number and extent of violations.  The Court therefore finds that defendant is  liable under the Clean Water Act, 33 U.S.C. § 1317, for violating numeric effluent limitations for BOD, TSS, and pH contained in condition S1 of state waste discharge permit ST0003861 as follows:

| Violations of Biochemical Oxygen Demand (BOD) Limit Limit: 1430 lbs/day, 3-day rolling average | |
|---|---|
| **Date** | **Components of 3-day average BOD lbs/day** |
| 03/04/08 | 2274 |
| 03/05/08 | 1592 |
| 03/06/08 | 1251 |
| 3-day average | 1706 |
| | |
| 08/18/09 | 1931 |
| 08/19/09 | 1551 |
| 08/20/09 | 1678 |
| 3-day average | 1720 |
| 08/21/09 | 1112 |
| 3-day average | 1447 |
| | |
| 08/26/09 | 1024 |
| 08/27/09 | 2001 |
| 08/28/09 | 1690 |
| 3-day average | 1572 |
| | |
| 12/07/10 | 1729 |
| 12/08/10 | 1592 |
| 12/09/10 | 4329 |
| 3-day average | 2550 |

| | |
|---|---|
| 12/10/10 | 1000 |
| 3-day average | 2307 |
| 12/11/10 | 799 |
| 3-day average | 2043 |
| | |
| 12/14/10 | 1655 |
| 12/15/10 | 2058 |
| 12/16/10 | 1841 |
| 3-day average | 1851 |
| 12/17/10 | 794 |
| 3-day average | 1564 |
| | |
| 01/25/11 | 1033 |
| 01/26/11 | 2383 |
| 01/27/11 | 1102 |
| 3-day average | 1506 |
| 01/28/11 | 892 |
| 3-day average | 1459 |
| | |
| 02/01/11 | 1140 |
| 02/02/11 | 1879 |
| 02/03/11 | 1685 |
| 3-day average | 1568 |
| 02/04/11 | 1180 |
| 3-day average | 1581 |
| | |
| 02/08/11 | 1475 |
| 02/09/11 | 1501 |
| 02/10/11 | 1549 |
| 3-day average | 1508 |
| 02/11/11 | 1497 |
| 3-day average | 1516 |
| 05/26/11 | 1248 |
| 05/27/11 | 1560 |
| 05/28/11 | 2159 |
| 3-day average | 1656 |

| | |
|---|---|
| 05/29/11 | 1540 |
| 3-day average | 1753 |
| | |
| 06/14/11 | 1620 |
| 06/15/11 | 1647 |
| 06/16/11 | 1036 |
| 3-day average | 1434 |
| | |
| 07/19/11 | 1520 |
| 07/20/11 | 1889 |
| 07/21/11 | 1037 |
| 3-day average | 1482 |
| 07/22/11 | 1696 |
| 3-day average | 1541 |
| | |
| 01/18/12 | 853 |
| 01/19/12 | 1652 |
| 01/20/12 | 1935 |
| 3-day average | 1480 |
| 01/21/12 | 824 |
| 3-day average | 1470 |
| | |
| 12/11/12 | 1629 |
| 12/12/12 | 1306 |
| 12/13/12 | 1371 |
| 3-day average | 1435 |
| | |
| 07/16/13 | 1390 |
| 07/17/13 | 1533 |
| 07/18/13 | 1618 |
| 3-day average | 1514 |
| | |
| 11/13/13 | 1655 |
| 11/14/13 | 1513 |
| 11/15/13 | 1286 |
| 3-day average | 1485 |

|  |  |
|---|---|
| 12/10/13 | 1793 |
| 12/11/13 | 1232 |
| 12/12/13 | 1327 |
| 3-day average | 1450 |
| Total Violation Days = | 58 |

| Violations of Total Suspended Solids (TSS) Limit Limit: 825 lbs/day, 3-day rolling average | |
|---|---|
| Date | Components of 3-day average TSS lbs/day |
| 03/03/08 | 62 |
| 03/04/08 | 1674 |
| 03/05/08 | 930 |
| 3-day average | 889 |
| 03/06/08 | 671 |
| 3-day average | 1092 |
| | |
| 04/28/08 | 42 |
| 04/29/08 | 1070 |
| 04/30/08 | 1409 |
| 3-day average | 840 |
| 05/01/08 | 704 |
| 3-day average | 1061 |
| 05/02/08 | 476 |
| 3-day average | 863 |
| | |
| 06/19/08 | 430 |
| 06/20/08 | 1035 |
| 06/21/08 | 1517 |
| 3-day average | 994 |
| 06/22/08 | 379 |
| 3-day average | 977 |
| | |
| 07/15/08 | 987 |
| 07/16/08 | 1193 |
| 07/17/08 | 507 |
| 3-day average | 896 |
| | |
| 01/02/09 | 97 |
| 01/03/09 | 1253 |
| 01/04/09 | 1165 |

| | |
|---|---|
| 3-day average | 828 |
| | |
| 03/11/09 | 487 |
| 03/12/09 | 892 |
| 03/13/09 | 1402 |
| 3-day average | 927 |
| 03/14/09 | 597 |
| 3-day average | 964 |
| | |
| 05/27/09 | 740 |
| 05/28/09 | 1211 |
| 05/29/09 | 714 |
| 3-day average | 888 |
| | |
| 06/09/09 | 665 |
| 06/10/09 | 1109 |
| 06/11/09 | 754 |
| 3-day average | 843 |
| | |
| 08/17/10 | 414 |
| 08/18/10 | 1130 |
| 08/19/10 | 1092 |
| 3-day average | 879 |
| 08/20/10 | 460 |
| 3-day average | 894 |
| | |
| 10/12/10 | 1165 |
| 10/13/10 | 1018 |
| 10/14/10 | 523 |
| 3-day average | 902 |
| | |
| 11/30/10 | 756 |
| 12/01/10 | 885 |
| 12/02/10 | 1024 |
| 3-day average | 888 |

| | |
|---|---|
| 12/03/10 | 610 |
| 3-day average | 840 |
| | |
| 12/07/10 | 851 |
| 12/08/10 | 1479 |
| 12/09/10 | 1977 |
| 3-day average | 1436 |
| 12/10/10 | 628 |
| 3-day average | 1361 |
| 12/11/10 | 488 |
| 3-day average | 1031 |
| | |
| 01/01/11 | 715 |
| 01/03/11 | 424 |
| 01/04/11 | 1363 |
| 3-day average | 834 |
| | |
| 02/01/11 | 654 |
| 02/02/11 | 1310 |
| 02/03/11 | 767 |
| 3-day average | 910 |
| 02/04/11 | 595 |
| 3-day average | 891 |
| | |
| 05/03/11 | 1058 |
| 05/04/11 | 1036 |
| 05/05/11 | 776 |
| 3-day average | 957 |
| | |
| 05/26/11 | 549 |
| 05/27/11 | 786 |
| 05/28/11 | 1570 |
| 3-day average | 968 |
| 05/29/11 | 1298 |
| 3-day average | 1218 |

| | |
|---|---|
| 05/31/11 | 447 |
| 3-day average | 1105 |
| 06/01/11 | 788 |
| 3-day average | 844 |
| | |
| 05/21/12 | 157 |
| 05/22/12 | 1553 |
| 05/23/12 | 1108 |
| 3-day average | 939 |
| 05/24/12 | 673 |
| 3-day average | 1111 |
| 05/25/12 | 793 |
| 3-day average | 858 |
| 05/26/12 | 769 |
| 05/27/12 | 1080 |
| 3-day average | 881 |
| | |
| 05/30/12 | 810 |
| 05/31/12 | 1148 |
| 06/01/12 | 1154 |
| 3-day average | 1037 |
| 06/02/12 | 621 |
| 3-day average | 974 |
| | |
| 07/16/13 | 780 |
| 07/17/13 | 964 |
| 07/18/13 | 1166 |
| 3-day average | 970 |
| 07/19/13 | 533 |
| 3-day average | 888 |
| | |
| Total Violation Days = | 76 |

| Violations of pH Limit Limit: Not outside the range of 6.0 to 11.0 Standard Units (S.U.) | | |
|---|---|---|
| Date | Minimum pH (S.U.) | Maximum pH (S.U.) |
| 3/5/2008 | 3.4 | |
| 3/20/2008 | 4.6 | |
| 12/15/2008 | 3.4 | |
| 12/16/2008 | 5.1 | |
| 1/1/2009 | 2.8 | |
| 6/2009 | 5.6 | |
| 6/25/2012 | 5.5 | |
| 10/8/2012 | 5.2 | |
| 10/9/2012 | 5.6 | |
| 10/19/2012 | 4.7 | |
| 10/24/2012 | 4.6 | |
| 12/4/2012 | 4.95 | 12.0 |
| 12/5/2012 | 3.6 | |
| 12/7/2012 | 5.5 | |
| 12/13/2012 | 5.0 | |
| 12/14/2012 | 3.7 | |
| 12/17/2012 | 5.0 | |
| 1/5/2013 | 4.9 | |
| 1/15/2013 | 4.8 | |
| 1/21/2013 | 4.6 | |
| 1/24/2013 | 4.1 | |
| 1/26/2013 | 3.9 | 12.7 |

| | | |
|---|---|---|
| 2/1/2013 | 4.3 | 12.8 |
| 2/2/2013 | 4.4 | |
| 2/3/2013 | | 11.5 |
| 2/5/2013 | 4.7 | 12.6 |
| 2/7/2013 | 3.9 | |
| 2/8/2013 | 4.75 | |
| 2/10/2013 | 5.1 | 12.9 |
| 2/11/2013 | 4.5 | |
| 2/12/2013 | 3.7 | |
| 2/14/2013 | 3.6 | |
| 2/15/2013 | 4.05 | 12.3 |
| 2/19/2013 | 4.95 | 12.55 |
| 2/22/2013 | 4.0 | 12.0 |
| 2/23/2013 | | 13.4 |
| 2/26/2013 | 4.6 | |
| 2/27/2013 | 4.2 | |
| 3/6/2013 | 4.1 | 12.6 |
| 3/11/2012 | 4.9 | |
| 3/15/2013 | 4.8 | |
| 3/16/2013 | 4.4 | |
| 4/1/2013 | | 11.6 |
| 4/15/2013 | 4.82 | |
| 4/16/2013 | 5.4 | |
| 4/17/2013 | 5.6 | |
| 4/19/2013 | 3.58 | |
| 4/20/2013 | 5.56 | |
| 5/1/2013 | 4.8 | |
| 5/2/2013 | 5.6 | |

| | | |
|---|---|---|
| 5/9/2013 | 4.0 | |
| 5/10/2013 | 4.6 | |
| 5/11/2013 | 5.6 | |
| 5/13/2013 | 2.7 | |
| 5/14/2013 | 4.8 | |
| 5/15/2013 | 5.2 | 11.5 |
| 5/16/2013 | | 11.4 |
| 5/18/2013 | | 12.6 |
| 5/19/2013 | 4.0 | |
| 5/26/2013 | 4.2 | 11.1 |
| 5/28/2013 | | 11.2 |
| 5/31/2013 | | 12.4 |
| 6/1/2013 | | 12.0 |
| 6/2/2013 | | 11.2 |
| 6/8/2013 | 5.8 | |
| 6/10/2013 | 5.3 | 12.2 |
| 6/11/2013 | 5.5 | 11.2 |
| 6/12/2013 | 5.8 | |
| 6/13/2013 | 5.4 | |
| 6/14/2013 | 5.9 | |
| 6/19/2013 | 5.8 | |
| 6/27/2013 | 5.0 | |
| 7/1/2013 | 2.6 | 12.2 |
| 7/2/2013 | 5.2 | 12.0 |
| 7/5/2013 | 4.0 | 11.6 |
| 7/6/2013 | 4.0 | 11.6 |
| 7/7/2013 | 2.4 | |
| 7/9/2013 | 5.7 | |

| | | |
|---|---|---|
| 7/10/2013 | 4.7 | |
| 7/11/2013 | 4.8 | |
| 7/12/2013 | 5.4 | |
| 7/13/2013 | 5.4 | |
| 7/15/2013 | 5.5 | |
| 7/19/2013 | 5.6 | |
| 7/20/2013 | 5.7 | 12.2 |
| 7/21/2013 | 4.6 | |
| 7/22/2013 | 4.4 | 12.0 |
| 7/27/2013 | 5.7 | |
| 7/30/2013 | 5.0 | |
| 7/31/2013 | 5.8 | 11.8 |
| 8/3/2013 | 4.2 | |
| 8/4/2013 | 5.4 | |
| 8/6/2013 | 5.9 | |
| 8/8/2013 | | 12.0 |
| 8/11/2013 | 5.6 | |
| 8/28/2013 | 4.6 | |
| 11/13/2013 | 4.8 | |
| 11/26/2013 | 4.2 | |
| 12/9/2013 | 5.0 | 12.1 |
| 12/10/2013 | 5.6 | |
| 12/11/2013 | 5.7 | 11.2 |
| 12/12/2013 | | 11.3 |
| 12/17/2013 | 5.7 | |
| 12/19/2013 | | 12.0 |
| 12/21/2013 | | 12.3 |
| 12/24/2013 | | 11.9 |

| | | |
|---|---|---|
| 12/25/2013 | 2.4 | 12.4 |
| 12/26/2013 | 5.5 | 11.9 |
| 12/28/2013 | | 11.2 |
| 12/29/2013 | | 11.8 |
| 12/30/2013 | | |
| 12/31/2013 | | 11.5 |
| 1/3/2014 | | 12.4 |
| 1/4/2014 | | 11.1 |
| 1/5/2015 | | 11.2 |
| 1/6/2014 | | 11.9 |
| 1/11/2014 | 4.7 | 12.3 |
| 1/12/2014 | | 12.2 |
| 1/22/2014 | 4.1 | |
| 1/30/2014 | 5.9 | |
| Total Violation Days = | | 143 |

## C. AKART Requirement

Defendant's state waste discharge permit requires it to "treat all industrial wastes containing pollutants by using all known, available, and reasonable methods for treatment prior to discharge to the sanitary sewer."  Dkt. # 44-1, § S4.C.5.  Plaintiff seeks a determination that, as of October 23, 2012 (the date on which the complaint in this case was filed), defendant was in violation of this permit requirement.  Plaintiff's evidence consists of (1) the undisputed fact that defendant's then-existing dissolved air flotation ("DAF") system had failed to prevent numerous discharges in excess of the numeric

permit limitations; (2) other poultry processing facilities, including nine out of ten

facilities owned by defendant's grandparent company that discharged to POTWs, utilized

equalization tanks as part of their pretreatment systems; (3) one food processing facility

and a number of chemical facilities utilized flocculation chambers in their pretreatment

systems; and (4) defendant installed both an equalization tank and a flocculation chamber

in December 2013.  Defendant argues that Washington's Department of Ecology

("DOE") found that its DAF system satisfied the AKART requirement when it reissued

the permit on September 30, 2010, and that plaintiffs cannot challenge that determination

in the context of this suit.

RCW 90.48.520 requires DOE to review a permit applicant's "operations

and incorporate permit conditions which require all known, available, and reasonable

methods to control toxicants in the applicant's wastewater."  DOE incorporated just such

a requirement in defendant's 2010 permit.  In an accompanying "Fact Sheet," DOE

provided an explanation of its permit decisions.  With regards to the AKART provision,

DOE stated that it would not impose any "specific limitations based on AKART criteria,"

but that it "considers the performance of [defendant's] DAF system to be consistent with

AKART requirements."  Dkt. # 53-7 at 3.  Defendant argues that this statement

conclusively establishes its compliance with the permit's AKART requirement.  Plaintiff

argues that the quoted statements are inadmissible as undisclosed expert opinion or

hearsay.  Neither argument is persuasive.

The AKART requirement is "clearly meant to foster the use of new

emission control technology" in the hopes of someday "extinguish[ing] sources of water

quality degradation." <u>Puget Soundkeeper Alliance v. Washington Dep't. of Ecology</u>, 102

Wn. App. 783, 789, 792 (2000).  Defendant's argument that a statement in the "Fact

Sheet" should trump the express permit requirement that defendant use "all known,

available, and reasonable" treatment methods is factually and legally unsupported.  There

is no indication that DOE intended that defendant use the "Fact Sheet" as a shield against

any technological upgrades that became available during the permit's five year term.  Nor

is it clear that DOE would have the power to do so:  a preemptive declaration of AKART

compliance, notwithstanding changes in the permitee's operations or the availability of

new technologies, would thwart the legislature's express command in RCW 90.48.520

and, in fact, the express requirements of the permit.

   The "Fact Sheet" is not meaningless, however.  One could argue that, at

least as of September 30, 2010, DOE believed that defendant's DAF system satisfied the

AKART requirement.  While such a finding would not bind plaintiff or the fact finder in

this litigation (<u>Ass'n to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res.</u>, 299

F.3d 1007, 1012 (9th Cir. 2002) ("[N]either the text of the Act nor its legislative history

expressly grants to the EPA or [an authorized] state agency the exclusive authority to

decide whether the release of a substance into the waters of the United States violates the

Clean Water Act."); <u>Sierra Club v. Portland Gen. Elec. Co.</u>, 663 F. Supp.2d 983, 997 (D.

Or. 2009) ("The citizen suit provisions in both [the Clean Water Act and the Clean Air

Act] are nearly identical, and grant citizens the right to challenge the actions of

companies alleged to be in violation of the law, regardless of whether the government

believes them to be in violation of the law.")), it is evidence that weighs in favor of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

defendant on the AKART claim.  Plaintiff's objections to the admissibility of the "Fact

Sheet" are overruled.  The "Fact Sheet" is not subject to the disclosure requirements of

Fed. R. Civ. P. 26(a)(2):  it is not an expert witness, nor was the person(s) who created it

"retained or specially employed to provide expert testimony in the case."  With regards to

the hearsay objection, the "Fact Sheet" is a "record or statement of a public office" which

sets out factual findings following a legally authorized application and review process

under Fed. R. Ev. 803(8).  Plaintiff is free to argue that the investigation and review of

defendant's wastewater treatment system was cursory, that the statement is ambiguous,

and/or other factors that might reduce the weight given the statement (see Sullivan v.

Dollar Tree Stores, Inc., 623 F.3d 770, 778 (9th Cir. 2010)), but the Court finds that the

source of the "Fact Sheet" and the context in which it was created are sufficient

indications of trustworthiness to warrant its admission into evidence.

       The question, then, is whether either party has shown that it is entitled to

summary adjudication on the AKART claim.  Determining whether defendant utilized

"all known, available, and reasonable methods" to treat its wastewater throughout the

limitations period will require consideration of available technologies, their application in

the food processing industry, and the financial and operational burdens of adoption.  The

state legislature has made clear that the goal of ensuring the purity of the waters of the

state must be pursued in a way that is consistent with not only public health and wildlife

protection, but also "industrial development of the state."  RCW 90.48.010.  The mere

availability of certain technology in the marketplace cannot be the only consideration:

the technology may not be compatible with existing operations, it may be cost

prohibitive, or the benefits of adoption may be so minimal that it would not be reasonable.[2]  Nor does the fact that defendant adopted existing technology in December 2013 establish as a matter of law that the balance of competing factors made the technology "known, available, and reasonable" as of October 23, 2012.  While defendant's repeated permit violations between September 30, 2010, and the date this action was filed suggest that the need to adopt better technologies despite the financial burdens was fast becoming apparent, when, exactly, the utilization of an equalization tank and flocculation chamber became not only "known" and "available" but "reasonable" cannot be ascertained as a matter of law.  The Court finds that there is a genuine issue of fact regarding if and when defendant violated the AKART requirement.

**D.  Notice of Intent to Sue**

On August 13, 2012, plaintiff sent a Notice of Intent to Sue, as required by 33 U.S.C. § 1365(b).  The notice advised "Draper Valley Holdings LLC dba Draper Valley Farms" that plaintiff intended to file a citizen's suit against "Draper Valley Farms, Inc.," under the Clean Water Act.  Dkt. # 47-1.  Suit was subsequently filed against Draper Valley Holdings LLC dba Draper Valley Farms.  Defendant argues that the insertion of "Inc." in the notice made it impossible for the recipient to identify "the person or persons responsible for the alleged violation."  40 C.F.R. § 135.3.  This argument is not well-taken.  Taken in the context of the remainder of the notice,

---

[2]  Two years before this suit was filed, the regulatory agency charged with evaluating defendant's system in the context of the Clean Water Act's permitting scheme arguably decided that the DAF system struck the appropriate balance between environmental protection and industrial development.

defendant could not possibly have been confused about the identity of the alleged

polluter:  plaintiff clearly identified the relevant permit number (which identified Draper

Valley Farms, Inc, as the permitee), the location of the slaughterhouse facility, and the

dates on which violations were alleged to occur.  Although the record shows that

defendant used at least three names while operating the Mount Vernon facility, there is

no indication that, upon receipt of the Notice of Intent to Sue, it was in any way confused

regarding the identity of the entity responsible for the alleged violations.  The notice

provided on August 13, 2012, was sufficient.


For all of the foregoing reasons, plaintiff's motion for summary judgment

(Dkt. # 41) is GRANTED in part and DENIED in part.  Defendant's motion for summary

judgment (Dkt. # 49) is DENIED.


Dated this 22nd day of April, 2014.


HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE